**Russell G. COURTNEY, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 20769.**

United States Court of Appeals
Ninth Circuit.

March 1, 1968.

Rehearing Denied May 1, 1968.

F. Conger Fawcett, San Francisco, Cal. (argued), for appellant.

Robert L. Brosio (argued), Asst. U. S. Atty., Chief, Criminal Division, William Byrne, Jr., U. S. Atty., Los Angeles, Cal., for appellee.

Before HAMLEY, HAMLIN and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge:

A seven count indictment charged appellant in five counts of violating 18 U.S.C. § 2421 [Mann Act], in one count of violating 18 U.S.C. § 2422 [Mann Act], and in the last count charged appellant and one Barry Kornhaber of violating 18 U.S.C. § 1503 [obstruction of justice].

Trial to a jury resulted in a mistrial because the jury was unable to reach a verdict. In the course of that trial one of the counts (Count Five), charging a violation of § 2421, was dismissed.

On retrial to a jury, appellant was convicted on four counts charging violation of § 2421, one count charging violation of § 2422, and on the count charging violation of § 1503. Kornhaber was acquitted by the jury on the obstruction of justice count.

Appellant was committed to the custody of the Attorney General for a term of four years on each of three counts charging a violation of § 2421, all sentences to be served concurrently, and to three years on each of the three counts, one charging a violation of § 2421, one charging a violation of § 2422, and one charging a violation of § 1503, the sentences to be served concurrently, but consecutively to the sentences imposed on the three counts first mentioned.

Appellant appeals from the judgment of conviction entered against him. This court has jurisdiction under 28 U.S.C. §§ 1291 and 1294(1).

The § 2421 violations occurred during the period commencing on or about May 15, 1964, and ending on or about June 7, 1964, and involved two trips from Los Angeles County, California, to Las Vegas, Nevada, and two trips from Las Vegas to Los Angeles. By its verdict, the jury found, in each

instance, appellant knowingly transported one Loretta Hoskins from one place to the other in interstate commerce, for prostitution, debauchery, and other immoral purposes.

The § 2422 violation occurred on or about June 12, 1964. By its verdict the jury found that appellant knowingly persuaded and coerced the said Loretta Hoskins to go into interstate commerce to Las Vegas, from Los Angeles, for prostitution, debauchery, and other immoral purposes and with the intent that Loretta Hoskins engage in the practice of prostitution, and thereby knowingly caused her to go and to be carried and transported as a passenger upon the line and route of a common carrier in interstate commerce.

The § 1503 violation occurred on or about August 5, 1964. By its verdict the jury found that appellant corruptly endeavored to influence, obstruct and impede the due administration of justice by corruptly endeavoring to impede and influence Loretta Hoskins, who had been and was to be a witness before the Federal Grand Jury, in connection with testimony that she had given and was to give before the Federal Grand Jury in its investigation and inquiry into possible violations of the Mann Act.

The testimony on the Mann Act charges was supplied, in the main, by Loretta Hoskins. Corroboration of parts of her testimony was supplied by landlords, motel operators, and telephone operators, who testified to seeing Loretta Hoskins and the appellant, or either one of them, and/or renting to them, or one of them, accommodations at particular times and places.

The testimony of Loretta Hoskins followed the usual pattern of testimony of a prosecutrix in this type of case. She testified that she was reluctantly coerced and induced by the appellant to enter into prostitution by promises and blandishments of appellant; that she turned over her earnings of prostitution to appellant, who transported or sent her back and forth between Los Angeles and Las Vegas, to engage in prostitution; that she was beaten by appellant; that she was dispossessed of her furniture by appellant; that she was instructed in the art or business of prostitution and recruiting customers by appellant and another prostitute named Beverly Caputo (sometimes known as Renee Dubeau), who was also in the service of appellant; and that she remained in the service of appellant through coercion, fear and threats of appellant.

She further testified that on June 13, 1964, she voluntarily went to the police station in Las Vegas, and later to the sheriff's office, and told the law enforcement officers the complete story of her activities in prostitution and her associations with appellant.

Appellant's defense, basically, was that while he knew of the trips to Las Vegas, and had gone there himself, and knew that Mrs. Hoskins and Miss Caputo had engaged in prostitution activities, that that activity and the trips back and forth were not under his control, and that he made trips to Las Vegas to secure arrangements for employment as an entertainer, from which, and as a magazine representative, he made his living; that Loretta Hoskins' charges were false and were motivated by jilted-lover revenge.

The events relating to the § 1503 charge may be briefly stated. Loretta Hoskins testified that on August 5, 1964, she visited a night club, where she had been previously employed, to see the owner-manager, Barry Kornhaber, and to pick up a typewriter she had left there. At a later meeting, Kornhaber told Loretta Hoskins that he had talked earlier to appellant, who told him about the events that occurred in Las Vegas; that appellant asked Kornhaber to tell her that he wanted to talk to her, and that he would give her cash, a trip to Hawaii, and would return her furniture if she would not testify against him. Later appellant and Loretta Hoskins met and appellant repeated his offer; that she mentioned that she had testified before the Grand Jury, and had talked to the FBI; that appellant pleaded with her and threatened to notify her family of her activi-

ties. At a later meeting, at which appellant, Kornhaber, and Loretta Hoskins were present, the same promises and threats were made. At that meeting, Loretta Hoskins was talked into signing a note which terms were dictated by appellant. In substance the note stated that she had lied to the authorities, and that appellant had nothing to do with her prostitution activities.

The defense of appellant and Kornhaber to the § 1503 charge was that they had not coerced Loretta Hoskins in any way; that she had written the retraction note voluntarily. Both denied any knowledge at the time the note was written that any federal charges might be brought against appellant, and they both believed that Loretta Hoskins' charges related only to possible State charges of pimping and pandering.

Appellant sets forth numerous specifications of error. He does not contend that the evidence is insufficient to support the jury verdict. He does contend, however, that the conviction should be set aside because of the "inherent incredibility" of Loretta Hoskins' testimony.

Our review of the record, in the light most favorable to support the verdict, satisfies us that the verdict is supported by ample evidence. We are unable to agree with appellant that the testimony of Loretta Hoskins is inherently incredible. In light of our view that the jury verdict is fully supported by the evidence, we see no purpose in setting forth all of the evidence in detail, but will only set forth such portions thereof as we deem necessary to properly review those specifications which appear to us to be well taken.

The record reveals that Beverly Caputo, above mentioned, was called as a witness by the Government, and testified in the first trial which resulted in a mistrial. Between the date of the mistrial and the commencement of the trial under review, appellant and Beverly Caputo were lawfully married. She was in attendance throughout the Government's case in the second trial, under subpoena issued by the Government.

Immediately prior to the commencement of the trial, a conference was held in the chambers of the district judge at which were present the district judge, appellant, co-defendant Kornhaber, their counsel, and counsel for the Government. During the conference the district judge stated that "somebody alerted me to a marriage problem. Let's find out about that." A colloquy between court and counsel ensued, relating to the "marriage problem," during which counsel for appellant stated that appellant and Beverly Caputo were married some time prior to the commencement of the second trial, and furnished to Government counsel the marriage certificate.

Further discussion on whether Beverly Caputo was compellable as a witness for the Government followed. At this conference the district court gave no indication of what his ruling might be, in the event the problem should arise during the course of the trial. At the conference, Government counsel stated that at the first trial the Government:

> "called Caputo as a witness. Now, she was a hostile witness. * * * She took the stand and was totally hostile, and answered the questions, the Government would allege, untruthfully when she stated flatly that she had not worked for the defendant as a prostitute, and for that matter that she had never been a prostitute."

On the following day, and after the commencement of the trial, a further conference was had in chambers, out of the presence of the jury, at which were present the district judge, appellant and his co-defendant, Kornhaber, their counsel, and counsel for the Government. The district judge stated:

> "Let's refresh our memory as to what matters we wanted to take up. One of them I know was this question of the competency to testify of the woman who is alleged to be the wife of the defendant at present."

At that conference, Government counsel stated that he had been shown a copy of the marriage certificate "which appears to be appropriate and showing the marriage of the defendant to Beverly Caputo." The district judge stated:

"My view at this moment is that under both federal case law and the State of California law the wife is incompetent to testify against her husband. She is, of course, competent to testify for him.

"I don't believe, unless you can show me some additional facts, that we have a situation here in which it would fall into either of two exceptions which the cases lay out. One of those exceptions is the so-called 'sham marriage' exception. The other is when the testimony concerns a crime against the wife."

After further discussion on other matters, counsel for appellant stated:

"May I just say one thing? I hate to keep prolonging this. But on the question of Mr. Courtney's wife, I think it is proper to put her on, if there is any question of validity of the marriage, to put her on the witness stand outside the presence of the jury and have the facts brought out of her claiming the privilege. And that can be done probably after the recess before the jury comes in."

Thereupon the court inquired of Government counsel as to his views. Government counsel stated:

"Your Honor, this is a problem I haven't researched fully. We have to get in on the whole question of marriage. But one thing disturbs me, and that is this, there is a strong possibility that this jury might wonder why Mrs. Courtney is not being called, or Beverly Caputo, as she was referred to in the past trial, and no doubt during the transcript of impeachment. And otherwise she will be referred to again. I think that there should be some indication by the court as to the reason for her not appearing; that is that there has been exercise of the privilege."

Whereupon the court stated:

"I am sorry, Mr. Stanley [appellant's counsel], but I will have to deny the request. If the Government calls this woman, and it is claimed that she is incompetent to testify on account of being the defendant's wife, a claim will be made after she is sworn. I think that is the proper time for it, and we will then hear the Government's position.

"I am sorry, but that procedure should and will in this case be carried forward in open court."

On the following day, in chambers, outside the presence of the jury, the following colloquy occurred between the district court and counsel for the Government:

"MR. MILLER: As to the other two matters, your Honor, I take it you have ruled with respect to the privilege, if it is asserted, by Beverly Caputo.

"THE COURT: Yes. Unless you have something different, some additional authority or theory in the matter.

"MR. MILLER: Just briefly, your Honor. I must admit that I have read the Hawkins case closely, and in all candor I would say that your Honor's ruling is probably correct in that situation, because that did deal with a similar situation whereby a woman was not charged in the indictment.

"However, reading Professor Wigmore, especially as quoted in the later Wyatt case, although the facts are not the same, I concede it would seem to me that this whole spirit, if this became privilege, would dictate that perhaps we are at a point where a situation like this would call for an exception to the privilege. But I did want to call your Honor's attention to Hawkins. I think perhaps it is in point, as far as the claim to privilege.

"I would like to say that—has your Honor ruled that the privilege must be claimed by one of the parties?

526

"THE COURT: Yes, of course."

Beverly Caputo was not called as a witness, either on behalf of the Government or the appellant.

As indicated, the district court ruled that the exercise of the privilege by either spouse, not to have appellant's wife testify against him, would have to be exercised after the wife was sworn as a witness in open court, and before the jury. In our view the district court erred in such ruling.

We believe that such privilege was exercised by the timely request made by appellant's counsel that such proceedings take place in chambers, and outside the presence of the jury. Cf. Tallo v. United States, 344 F.2d 467 (1st Cir. 1965); San Fratello v. United States, 340 F.2d 540 (5th Cir. 1965); and concurring opinion of Judge Hamley in Bisno v. United States, 299 F.2d 711 (9th Cir. 1961).

The Government relies upon the majority opinion in Bisno v. United States, supra, to support the ruling of the district court. In our view such reliance is misplaced.

In *Bisno*, the question of the spousal privilege did not arise until during the closing argument of the Government. In that case two of the ten specific items of property allegedly concealed from a trustee in bankruptcy by Bisno, a bankrupt, were a note of the Exeter Hotel in the sum of $2,000.00 dated December 20, 1955, payable to Sally Bisno, wife of the bankrupt, and a cashier's check in the sum of $2500.00 dated December 29, 1955, drawn on the Bank of America, payable to "Al Bisno or Sally Bisno." Referring to these items in his closing argument to the jury, counsel for the Government said:

"The $2500.00 cashier's check and the money that went into the Exeter Hotel, Mr. Strong [counsel for appellant] states that this is all Sally's [appellant's wife]. What did Sally say? Sally didn't say anything. She sat in court and did not testify."

In an effort to offset this remark, counsel for appellant then proposed the following jury instruction:

"You are to draw no adverse inferences from the fact that defendant's wife did not testify at this trial. * * *"

The trial court refused to give this instruction and on appeal Bisno argued that this was error. On the appeal the majority opinion of this court expressed the view that the district court did not err in this regard. In the majority opinion it is stated:

"Bisno made no attempt to call his wife as a witness on his behalf to rebut evidence that his wife had transferred her rights in such items of property to Bisno for consideration." Id. p. 720.

And:

"Since the record is silent as to whether Bisno made any request that his wife testify for him, it is not known whether she would have been willing to do so." Id. p. 721.

And:

"Bisno argues that he did not have it within his power to compel his wife to testify in his favor because she could have refused to testify and, therefore, the trial court should not have permitted adverse comment on his failure to do an act which was legally impossible for him to do. This argument might have merit if Bisno had called his wife to testify for him and she had refused to do so. Bisno made no attempt to call his wife as a witness and therefore his argument assumes too much." Id. p. 722.

And:

"We wish to make it clear in this case that Bisno's wife was not called as a witness on his behalf and did not exercise her privilege to refuse to testify." Id. p. 722.

The situation in *Bisno* is to be contrasted with the situation in the instant case in which appellant endeavored to have his wife sworn and the privilege

exercised in the judge's chambers and out of the presence of the jury.

Since we hold that the privilege was exercised by the timely request made by appellant's counsel that the proceedings take place in chambers, and outside the presence of the jury, it follows that Government counsel committed plain error in commenting on the failure of appellant to call his wife as a witness, and in arguing that if called, her testimony would have been adverse to the appellant's case.

In the course of his opening and closing arguments to the jury, counsel for the Government, among other things, stated to the jury:

"Then we have the first trip on May 15, 1964. This was the trip that Mr. Courtney sent Beverly Caputo and Lorrie Hoskins on, used his car, his white Thunderbird, and they went up to Las Vegas. You heard Lorrie Hoskins' testimony about that.

They were instructed what to do, to go up to Las Vegas, to make certain contacts, and to start prostitution activities up there. They weren't too successful at first—on this weekend they were not. They came back May 18th, again in the white Ford, white Thunderbird. And at this time they went to 4734 Kraft, where the testimony of Mrs. Hoskins showed that both girls were beaten.

Of course, the defendant denies this. He did not even know that Lorrie Hoskins was going on this trip. He just found out when a telephone call was made indicating that Beverly Caputo was sick and that Lorrie would drive home.

Do you really believe that? But, again, coming within the meaning of the Government's case, 'Yes. They were together. But the reason, just a trumped up case against me.'

Incidentally, ladies and gentlemen, there might have been someone to explain that trip if it had been the truth. If the reasons for Beverly Caputo were to have gone up there to look for a job, not to have carried on prostitution activities, *why do you think she was not called as a defense witness? And couldn't she have explained some of these things very adequately for you, if there were honest, proper motives behind the trip? What do you think about that?"* (Emphasis added).

"And what did Kathy Lomonte tell you ladies and gentlemen? That she met him, met the defendant, the early part of 1965. That in March and April of 1965 he arranged prostitution dates for her with Laura Naples, the very nervous woman who took the stand yesterday on behalf of the defendant. *And with Mrs. Courtney, whom you do not see around here today, and who didn't take the stand."* (Emphasis added).

"Again, ladies and gentlemen, there is no contention that Beverly Caputo did not model, that she wasn't modeling in these magazines which you will have for your consideration. The point is that she was a prostitute as well. And again it is suggested to you that Beverly Caputo has been a very integral part of this case. It is alleged by Mrs. Hoskins that she was on the trip from May 15th to May 18th. *Where is she to explain what the true facts are; that she is a model, not a prostitute? Why was she on this trip?* Purely for honest motive? *Why isn't that explained?"* (Emphasis added).

"Is there a reason as to why there are not more people, tricks from Las Vegas, bellhops, other people who have seen it? Do you think it would be possible to get that sort of testimony? And then wonder if that is reasonable that these people are not here because they wouldn't be the type to admit their participation in anything like that. Just like Bill Wagoner denied that he had any participation in this thing.

Won't you ask yourself, *where is Beverly Courtney? Why has she not been called? Could she straighten the*

*matter out? What would her testimony be?"* (Emphasis added).

The Mann Act charges set forth in the indictment cover the period from on or about May 14, 1964, to on or about June 12, 1964. Mrs. Hoskins made her complaint to the law enforcement officers at Las Vegas, Nevada, on June 13, 1964. Appellant was arrested on the same day or the following day.

■ Over the objections of appellant, a prosecution witness, an undercover police officer of the Los Angeles Police Department, testified that on July 7, 1964, almost a month after appellant's arrest and after the occurrence of the events charged in the Mann Act counts, he went to the apartment residence of appellant, who was not on the premises, and was greeted at the door by Beverly Caputo who was clad only in the bottom portion of a brief bikini; that he was ushered into the living room and then into a bedroom where he paid her $100.00 for prostitution services; that he then followed her into another bedroom where she placed the money in a box in a bureau drawer; and that both of them returned to the front bedroom where she removed the short bikini, at which time she was placed under arrest on a State charge of practicing prostitution.

We believe that the district court erred in admitting such testimony. Its relevance, if any, to the Mann Act charges against appellant, was slight when compared to its prejudicial character, and such testimony should not have been admitted.

■ In the early stages of the cross-examination of appellant, Government counsel asked appellant the following question:

"Isn't it a fact that you married Beverly Caputo so as to preclude her from being called as a Government witness in this case?"

Appellant's prompt objection to the question was sustained and the question was not answered.

On rebuttal, the Government offered the testimony of Kathy Lomonte. Her testimony related to events which occurred not earlier than February 1965, more than seven months after appellant's arrest. According to Government counsel the purported purpose of her testimony was to impeach certain testimony given by appellant. In the course of that examination, the following occurred:

"Q Did the defendant say anything to you with reference to Renee and marrying Renee?

A Oh. He said he was going to marry her.

Q Did he say why?

A I believe to keep her from testifying against him.

Q Is that what the defendant said to you?

A Yes."

Immediately thereafter, defense counsel approached the bench and, out of the hearing of the jury, moved for a mistrial based upon the improper prejudicial character of the witness's testimony. The motion was denied. Counsel for defendant renewed his motion following the redirect examination of the witness. The motion was again denied.

During argument in chambers, Government counsel contended that the questions directed to Miss Lomonte were proper as impeachment of appellant's testimony that he had not married Beverly Caputo to keep her from testifying against him. As indicated above, appellant gave no such testimony because objection was sustained to the question directed to him. The question was never answered, a fact which Government counsel, for some reason, claimed he failed to remember. Government counsel conceded he knew what answers would be forthcoming from Miss Lomonte to his questions.

In our view the questions were deliberately asked and the answers fully expected, the effect of which was to destroy the spousal privilege and was prejudicial to the appellant.

On the following day appellant's counsel renewed his motion for mistrial. At such time, some twenty hours after Miss

Lomonte's testimony, the record had been examined and it was revealed that the marriage question directed to the appellant had never been answered. The court again denied appellant's motion for mistrial, but stated to the jury:

"THE COURT: Ladies and gentlemen of the jury, yesterday during the testimony of the witness Kathy Lomonte, if you will remember, there was some testimony of a conversation between her and the defendant in which the defendant is alleged to have made some remark about why he married the woman known as Beverly Caputo.

Now, I am striking that portion of Miss Lomonte's testimony, and you are admonished to disregard it. The purpose of a marriage is irrelevant to the issues in this case."

We believe that the prejudicial character of Miss Lomonte's testimony, concerning the reason for the marriage, was not cured by the court's belated admonition. See Mora v. United States, 190 F.2d 749 (5th Cir. 1951); Cf. United States v. Stromberg, 268 F.2d 256 (2d Cir. 1959), cert. den. 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959); United States v. Maloney, 262 F.2d 535 (2d Cir. 1959), and Tallo v. United States, supra.

It is to be borne in mind that appellant's counsel offered to explore the validity and bona fides of the marriage, in chambers, outside the presence of the jury. Government counsel vigorously opposed such request and never questioned the validity of the marriage until the improper question which was directed to the appellant on cross-examination. Notwithstanding that the objection to such question was sustained, Government counsel persisted by his improper questions concerning the marriage, directed to Miss Lomonte.

The record is crystal clear that Government counsel never intended to call Beverly Caputo as a Government witness because of her hostility as a Government witness on the first trial. Notwithstanding this, we are satisfied that the only purpose that Government counsel had in mind in asking the questions of the two witnesses concerning the marriage was to leave the impression with the jury that if Beverly Caputo had been called as a witness, her testimony would have been favorable to the Government.

On direct examination appellant testified that he made his living as an entertainer and as a magazine representative. On cross-examination, Government counsel inquired as to the amount of appellant's income in 1964 and in 1963, and then asked appellant:

"Q Did you file an income tax return for '64?"

Appellant's counsel promptly objected. The court stated to the jury:

"The defendant is not on trial for income tax matters, ladies and gentlemen, and I caution you about that now. But I am going to overrule the objection. You may answer."

to which the appellant replied:

"No, I didn't pay income tax. I testified to that before.

"Q Did you file an income tax return?

"A No. I didn't even file one."

"THE COURT: * * * Ladies and gentlemen of the jury, let me re-emphasize that this defendant is not on trial for any alleged income tax violation. You are not to consider any such possible violation. This testimony has been permitted for the single purpose of attempting, if it does, to impeach the witness' testimony concerning his income during the years in question, and for no other purpose. So bear that in mind, please."

In our view the district court's attempt to avoid prejudice to appellant failed. The cross-examination by Government counsel was irrelevant, non-impeaching and prejudicial. Appellant's failure to file an income tax return does not impeach his testimony that he received income from non-sordid sources. The Government concedes that appellant did have income from such sources.

A jury should not be permitted to speculate that appellant received income from sordid sources because of his failure to file an income tax return, especially where it is conceded that he received income from non-sordid sources upon which he paid no tax and filed no income tax return. It is also noted that such testimony was evidence of another unrelated offense. The admission of such evidence was error. South v. United States, 368 F.2d 202 (5th Cir. 1966); Bowie v. United States, 345 F.2d 605 (9th Cir. 1965).

In our view the prejudicial character of the testimony was not cured by the district court's admonition. As stated in Thurman v. United States, 316 F.2d 205 (9th Cir. 1963):

"Indeed, the danger is so strong that the jury will infer from unrelated criminal conduct that the defendant probably committed the offense charged, or will condemn the defendant either for the unrelated conduct or simply because he is a bad person, regardless of his guilt or innocence of the offense charged, that admission of such material is treated as obviously prejudicial and admonitory instructions are commonly considered inefficacious. See, e. g., United States v. Magee, 261 F.2d 609 (7th Cir. 1958); Sang Soon Sur v. United States, 167 F.2d 431, 433 (9th Cir. 1948). Cf. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); United States v. Jacangelo, 281 F.2d 574 (3d Cir. 1960)."

We are unable to say that in this case the error in admitting such testimony did not influence the jury or that it had very slight effect.

Because of the errors set forth in this opinion, we conclude that the judgments of conviction based upon the Mann Act charges must be reversed. We deem it unnecessary to discuss other errors specified by appellant.

We now consider appellant's appeal from the judgment of conviction for violating 18 U.S.C. § 1503 [obstruction of justice].

Appellant's sole specification of error is that:

"Reversible error occurred when the trial judge failed to instruct the jury that extra-judicial statements of appellant's co-defendant were not admissible or to be considered as against appellant."

During the trial two FBI agents testified at some length, as Government witnesses, to extra-judicial statements made by the defendant, Kornhaber, outside of appellant's presence. One of these statements was signed by Kornhaber. No contention is made on this appeal that the statements were other than voluntary, and made after Kornhaber had been fully advised of all his constitutional rights. No objection of any kind was made by appellant to the introduction of this testimony, and no request was made, either immediately before or immediately after the testimony of the two FBI agents, that the district judge instruct the jury that such testimony was not admissible or to be considered as evidence as against appellant. In the course of his instructions to the jury, the court stated:

"An admission or incriminatory statement made or an act done by one defendant outside of court may not be considered as evidence against another defendant who wasn't present and saw the act done or heard the statement made.

The statute under which Count Seven has been brought makes unlawful any act, committed corruptly, in an endeavor to impede or obstruct the due administration of justice. The reasonable tendency of the acts done, to obstruct the honest and fair administration of justice, is the proper criterion.

Now, the instruction I am going to read now applies to the defendant Kornhaber only. He, as you will recall, is jointly charged with defendant Courtney under Count Seven involv-

ing alleged obstruction of and impeding the due administration of justice.

In a case where two or more persons are charged with the commission of a crime, the guilt of the accused may be established without proof that the accused personally did every act constituting the offense charged.

The law provides that 'Whoever commits an offense against the United States, or aids, * * *' or '* * * abets, * * *' in '* * * its commission, is punishable as a principal.'

Every person who thus wilfully participates in the commission of a crime by aiding or abetting the same may be found guilty of that offense. Participation is wilful if it is done voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

Now, I used the words 'aid' and 'abet.' Let me define those words for you.

In order to aid and abet another person to commit a crime it is necessary that the accused wilfully associate himself in some way with the criminal venture, and wilfully participate in it as he would in something he wishes to bring about; that is to say, that he wilfully seek by some act of his to make the criminal venture succeed.

I have again used the word 'wilfully.' And I again tell you that an act is 'wilfully' done, if it is done voluntarily and intentionally, with the specific intent to do something which the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

Now, an instruction with respect to either or both defendants, having left the instructions applicable solely to Kornhaber, defendant Kornhaber.

When two people knowingly associate themselves together to carry out a common plan, lawful or unlawful, there arises from the very act of knowingly associating themselves together, for such a purpose, a kind of partnership, in which each member becomes the agent of every other member.

So where the evidence in a case shows a common plan or arrangement between two people, evidence as to an act done or statement made by one is admissible against both, provided the act be knowingly done, and the statement be knowingly made, during the continuation of the arrangement between them, and in furtherance of some object or purpose of the common plan or arrangement.

In order to establish proof that a common plan or arrangement existed, the evidence must show that the parties to the plan in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish some common object or purpose.

In order to establish proof that a defendant was a party to or member of some common plan or arrangement, the evidence must show that the plan was knowingly formed, and that the defendant who is claimed to have been a member, knowingly participated in the plan, with the intent to advance or further some object or purpose of the plan.

In determining whether or not a defendant was a party to or member of a common plan, the jury are not to consider what others may have said or done. That is to say, the member of a defendant in a common plan must be established by evidence as to his own conduct—what he himself knowingly said or did.

If and when it appears from the evidence in the case that a common plan did exist and that the defendant was one of the members, then the acts thereafter knowingly done, and the statements thereafter knowingly made, by any person likewise found to be a member, may be considered by you as evidence in the case as to the defendant found to have been a member, even though the acts and statements may

have occurred in the absence and without the knowledge of the defendant, provided such acts and statements were knowingly done and made during the continuance of such common plan and in furtherance of some object or purpose of the plan.

Otherwise any admission or incriminatory statement made or act done by one person outside of court may not be considered as evidence against any person who wasn't present and saw the act done, or heard the statement made."

If the district court erred in failing to give such instruction immediately before or after the testimony of the two FBI agents, such error, in our view, is harmless. We have carefully examined the testimony given by the two FBI agents and the testimony of Kornhaber in his own behalf. No objection of any kind was made by appellant to the testimony of Kornhaber. Except in minor matters, his testimony was substantially the same as the testimony of the two FBI agents. Appellant made no request for any limiting instruction in respect to Kornhaber's testimony.

The judgment of conviction of appellant on Count VII of the indictment is affirmed. The judgments of conviction of appellant on Counts I, II, III, IV and VI are reversed.