UNITED STATES of America, Plaintiff-Appellee,

v.

Thomas O. ROBINSON, Jr., and Aleida Robinson, Defendants-Appellants.

No. 82–5366.

United States Court of Appeals, Sixth Circuit.

Argued May 4, 1983.

Decided July 9, 1986.

---

Bart Durham, Nashville, Tenn., Joseph Dalton (argued), for defendants-appellants.

Joe B. Brown, U.S. Atty., Nashville, Tenn., Robert J. Washko (argued), for plaintiff-appellee.

Before KEITH and WELLFORD, Circuit Judges, and COHN, District Judge.*

WELLFORD, Circuit Judge.

Following this court's reversal of the conviction of defendant, Thomas O. Robinson, Jr., 716 F.2d 1095 (6th Cir.1983), the Supreme Court vacated that judgment and remanded the cause "for further consideration in light of" *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). The parties have submitted supplemental briefs in respect to the remand and our further consideration of this case.

Although a more detailed review of the evidence underlying defendant's conviction may be found in our previous decision at 716 F.2d 1095, we will focus on remand upon the events surrounding the prosecutor's misconduct.

In closing argument the prosecutor summarized the evidence against defendants. The attorneys jointly representing defendants divided their summation. The first attorney focused upon asserted weaknesses in the government's case. The other defense attorney, however, began his closing argument by contending that the government had breached its duty of fairness to the accused and had failed to "play[ ] straight with the jury." He further claimed that the government unfairly filtered the evidence. Additionally, defense counsel charged five different times that the government had unfairly denied Robinson an opportunity to "explain" his actions.

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

After the defense summation, out of the jury's presence, the prosecutor then objected to defense counsel's contention in summation that the government had not given defendant a chance to "explain." He requested leave to rebut that contention, arguing that the defense had "opened the door" on that issue. Despite ample opportunity to defend his actions or to object to the proposed rebuttal, defense counsel remained silent. The district court, considering both the prosecution's right to reply and the accused's privilege against compulsory self-incrimination, ruled that in rebuttal the prosecutor could answer defendant's contention that he had been afforded no opportunity to explain.

In accordance with the ruling he had obtained from the court, the prosecutor began his closing argument with a rebuttal to defense counsel's attack on the government's conduct. Initially the prosecutor limited rebuttal to statements that defendant had numerous opportunities to explain his conduct during the government's investigation. He concluded, however: "He could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain." Defense counsel made no objection to those remarks and did not request any cautionary instruction. The trial court later instructed the jury that a defendant has no burden to produce any evidence and that "no inference whatever may be drawn from the election of a defendant not to testify." Defense counsel stated they had no objections to the court's instructions. Defendant, Thomas Robinson was subsequently convicted on two counts.

 The prosecutor's comment upon the defendant's failure to testify was a clear violation of the defendant's constitutional right not to testify. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *see also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, such error does not merit reversal per se and where defense counsel failed to make a contempo-

raneous objection to the error, as in this case, the conviction may be reversed only if it constituted plain error. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985); *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936); Fed.R.Crim.P. 52(b).

In *Young,* the prosecutor, in response to improper remarks by defense counsel in closing argument, improperly and unethically stated his personal conviction that defendant was guilty of the charged crime. Defense counsel failed to object to his opponent's comments. The Tenth Circuit subsequently reversed the conviction, concluding that the prosecution's prejudicial statements "were sufficiently egregious as to constitute plain error." *United States v. Young,* 736 F.2d 565, 570 (10th Cir.1983). Eight Justices agreed that the Tenth Circuit's reversal of Young's conviction could not stand. Five Justices held that "the argument of the prosecutor, although error, did not constitute *plain error* warranting the Court of Appeals to overlook the failure of the defense counsel to preserve the point by timely objection." *Young,* 105 S.Ct. at 1049 (emphasis added).

In addressing the possibility of plain error, Chief Justice Burger writing for the Court observed that "a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record." *Id.* at 1047. Based upon the record, to satisfy the plain error standard, the claimed error must "not only seriously affect[ ] 'substantial rights,'" but it must also have "an unfair prejudicial impact on the jury's deliberations." *Id.* n. 14.

In reviewing the record, the majority approved application of an "invited response" doctrine. The majority stated that a "Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Id.* at 1045. In making that determination, the conduct of defense counsel as well as the nature of the prosecutor's response are relevant. *Id.* Thus, where a prosecutor's comments are a reasonable re-

sponse to defense counsel's provoking remarks, a conviction should not be reversed.

Finding the prosecutor's statement to be error, the issue became "whether the prosecutor's 'invited response' taken in context unfairly prejudiced the defendant." *Id.* Reviewing the effect of the error upon the record as a whole, the Court observed several key facts. First, the Court noted that the prosecution prefaced its erroneous statements by emphasizing that it was responding to defense counsel's attacks. Although condemning the government for such misconduct, the Court found that the jury would have been able to understand the statements in context as a response to a defense attack. Second, the Court found the government's vouching for its case not to suggest that the government was relying upon facts outside of evidence presented at trial. Finally, the Court examined the overwhelming amount of evidence against defendant, finding little to support defendant's theory and concluded:

> Under these circumstances, the substantial and virtually uncontradicted evidence of respondent's willful violation provides an additional indication that the prosecutor's remarks, when reviewed in context, cannot be said to undermine the fairness of the trial and contribute to a miscarriage of justice.

> On this record, we hold that the argument of the prosecutor, although error, did not constitute plain error warranting the Court of Appeals to preserve the point by timely objection; nor are we persuaded that the challenged argument seriously affected the fairness of the trial. Accordingly, the judgment of the Court of Appeals, ordering a new trial based on the prosecutor's argument, is reversed.

*Id.* at 1049.

We are called upon to consider the effect of *Young* in reconsidering our judgment in this cause. *Young* was concerned about prosecutorial misconduct in disregard of

*ethical* principles by the prosecutor's improper injection of his personal view of defendant's intent and his ultimate guilt in response to his adversary's argument that "not a person in this courtroom ... think[s] that Billy Young intended to defraud...." *Id.* at 1041. There was also a prosecutor's call for the jury to "do its job" as jurors and thus not acquit defendant Young. Courts have concern about a prosecutor's injection of his personal views about a defendant's guilt because the prosecutor is not only an advocate but he is also "an administrator of justice." ABA Standards for Criminal Justice 3–1.1(b) (2d ed. 1980). The jury may view the prosecutor as possessing some kind of special "inside information" that leads him to a personal view of guilt; thus the prosecutor is ethically precluded from an attempt to take advantage of his special position as the representative of the people and an administrator of the justice system within his sphere of authority. According to *Young,* violation of this ethical duty not to express personal views concerning the effect or weight of evidence and/or the guilt of the defendant may, nevertheless, not constitute "plain error" requiring a reversal of conviction when there has been no contemporaneous objection by defendant's counsel.

█ In the instant case, on the other hand, there was a prosecutorial comment upon the exercise by Robinson of his *constitutional* right not to testify made in response to defense counsel's repeated assertion in final argument that the government gave Robinson no "chance to explain" his actions.[1] The district court allowed the government to respond in argument "that the defendants had every opportunity, if they wanted to, to explain this." If the prosecutor's comments had been limited to responding that the defendant, Robinson, was given the opportunity *throughout the investigation* to explain his position without directly pointing out his failure to take the witness stand, we would find little diffi-

---

1. *See Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Wilson v. United States,* 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650 (1893); *Angel v. Overberg,* 682 F.2d 605 (6th Cir.1982).

culty in deciding that there was no plain error. The trial court, however, without objection by the defendant, permitted the United States Attorney to respond in closing argument that Robinson had made no explanation *before the jury* about evidence supporting the indictment charges. This was permitted by the district judge, in an action taken before the Supreme Court's analysis in *Young*, as an "invited error" response to unfair comments repeatedly made by defendant's counsel in his argument.[2]

Viewing the prosecutor's remarks in context of the entire record in this case, we note that the argument by defendant's counsel emphasized that the government (1) had not "played straight with ... the jury;" (2) had not given Robinson a "chance to explain" (reiterated repeatedly); (3) had not been "fair;" and (4) had improperly handled the evidence and had not brought forth "all the proof that they should to show you guilt and innocence" but was instead "carefully filtered." The government responded by commenting directly on defendant's failure to take the stand, not just by explaining how the government had, in fact, been "fair;" had during the investigation afforded defendant an opportunity to set out his position; and had presented sufficient and substantial evidence to establish guilt as charged. As before indicated, both defendant's counsel and the prosecutor were wrong and "two apparent wrongs—do not make for a *right* result." *Young*, 105 S.Ct. at 1044 (emphasis added).

The prosecutor's *Griffin* violation, permitted by the district court, does not mandate per se reversal because such constitutional error may be deemed harmless, not affecting substantial rights. *See Chap-*

*man*, 386 U.S. at 23–24, 87 S.Ct. at 827–828. Although "[a] defendant is entitled to a fair trial but not a perfect one," *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953); *see also Delaware v. Van Arsdall*, —— U.S. ——, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), the plain error rule does operate upon errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Atkinson*, 297 U.S. at 160, 56 S.Ct. at 392; *see also Darden v. Wainwright*, —— U.S. ——, ——, 106 S.Ct. 2464, 2479, 91 L.Ed.2d 144 (1986) (Brennan, J., dissenting). Under all the circumstances in this case we find the prosecutor's *Griffin* error to have jeopardized the fairness of the trial.

In *Young*, the prosecutor's statements placed improperly into issue his credibility and beliefs about Young's guilt. In this case, however, the prosecutor's comments directly placed the *defendant's* credibility into issue by drawing attention to defendant's failure to testify. By raising before the jury's eyes the spectre of defendant's silence, the prosecutor, with the trial court's approval, encouraged the jurors to make inferences unfavorable to the defendant based solely upon defendant's right to remain silent.

The prosecutor's comments in this case, therefore, unreasonably exceeded the boundaries of response to defense counsel's contentions that the government had denied defendant an opportunity to explain. Furthermore, although very significant evidence supports Robinson's conviction, we cannot characterize the evidence presented before us as strongly as did the *Young* Court. The fact that the jury did not find Robinson guilty on all counts would indi-

---

**2.** The district court exceeded proper bounds in permitting both this argument by defendant's attorney and the prosecutor's remark upon defendant's election not to testify before the jury. Instead, the district court should have taken "prompt action ... in the form of corrective instructions to the jury, and ... admonition to the errant advocate." *Young*, 105 S.Ct. at 1045. The court's instructions to the jury at the conclusion of the arguments, however, did point out in two different places that the jury might draw no inference from defendant's election not to testify. His instruction in some degree mitigated the prejudice, but it did not "cure" the error even though defendant did not make an objection to this procedure. *See, e.g., United States v. Bates*, 512 F.2d 56, 58 (5th Cir.1975); *Courtney v. United States*, 390 F.2d 521, 529 (9th Cir.), *cert. denied*, 393 U.S. 857, 89 S.Ct. 98, 21 L.Ed.2d 126 (1968).

cate that the evidence, though substantial, was not as overwhelming as in *Young*. Nor do we find the court's belated, general instruction not to consider the defendant's silence an adequate cure of the harm to defendant's substantial constitutional right.

 Based upon the record as a whole, we conclude that the prosecutor's comments, violative of defendant's right not to testify, rise to the level of plain error because they affected defendant's substantial rights and probably impacted adversely on the jury's deliberations. Because the prosecutorial misconduct in this case constitutes constitutional error, we may notice such error more freely. *United States v. Brown*, 555 F.2d 407, 420 (5th Cir.1977), *cert. denied, sub nom. Seymour v. United States*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.E.2d 494 (1978). *Cf. Darden,* —— U.S. at ——, 106 S.Ct. at 2472 (1986) (distinguishing prosecutorial misconduct involving prosecutor's personal attacks on defendant from arguments implicating specific constitutional rights such as the defendant's right to remain silent). The plain error rule is to be used "sparingly" and to overcome misconduct that "undermine[s] the fundamental fairness of the trial and contribute[s] to a miscarriage of justice." *See Young*, 105 S.Ct. at 1047; *see also United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592, n. 14, 71 L.Ed.2d 816 (1982); *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). We find this stringent standard to be satisfied in this case because the "invited response" itself exceeded what was necessary to protect the government's interest and was itself suggested by the court.

Upon consideration of the facts and the evidence in this case and considering the prosecutor's remarks in context with the entire record, we, albeit with some reluctance, conclude that plain error was committed in this case because we cannot say beyond a reasonable doubt that the *Griffin* error was harmless. *See Bates*, 512 F.2d at 58. The decision on the issue presented and reconsidered is an exceedingly close

one, and we acknowledge that we set aside this conviction with reservations. Our considerable doubt about the fairness of the trial in light of the prosecutor's comment must result in giving the benefit of this doubt to the defendant Robinson. We have considered what we believe the probable effect of the improper (and unnecessary) remarks had upon the jury's ability to judge the evidence fairly.

Accordingly, we REVERSE the conviction of defendant, Thomas O. Robinson, Jr., and REMAND for further proceedings consistent with this opinion.

COHN, District Judge, dissenting.

The question on remand is whether the prosecutor's statements in rebuttal "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice," *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985), when viewed "against the entire record," *id.* Put another way, was the "jury ... influenced to stray from its responsibility to be fair and unbiased" by the statement. *Id.*, 105 S.Ct. at 1048. Since my review of the evidence at trial, as marshalled in the uncontradicted description in the government's Brief On Behalf Of Plaintiff-Appellee filed on remand (see Appendix), satisfies me the answer to these questions is in the negative, I respectfully dissent. My view that the prosecutor's wholly improper argument had no effect on the outcome of the trial is reinforced by the facts that the jury acquitted Robinson of two of the four charges against him and that we have no doubts as to the propriety of the conviction of his wife. Lastly, I am constrained to observe that the test required by the Supreme Court in the circumstances of improper prosecutorial argument is likely the same whether it is a disregard of ethical principles or a wrongful comment upon the exercise of a constitutional right. *See Delaware v. Van Arsdall*, 39 Crim.L.Rep. (BNA) 3007 (U.S. Apr. 7, 1986).

## APPENDIX *

[I]n early 1979 [Robinson] leased a truck stop in Guthrie, Kentucky, and purchased a $31,000 fire insurance policy on a wrecker and the contents of the truck stop's garage. On August 30, 1979, [Robinson] increased the insurance coverage on the garage contents from $31,000 to $50,000. Two days later, on September 1, 1979, there was an explosion and fire in the garage. [Robinson] subsequently submitted an $80,000 insurance claim for the loss of the wrecker and the contents of the garage and an adjoining office.

Earlier in 1979, [Robinson] told a man whom he had solicited to become a partner in the truck stop that if the business turned out to be unsuccessful, he had a large inventory and could burn it. [Robinson] was consistently delinquent on his rent, and by September 1979 his business had significantly deteriorated. According to a local police officer who had previously worked for him, [Robinson] abruptly removed his race car and personal tools from the garage two or three weeks prior to the fire.

The day after the fire [Robinson's] insurance agent, Aaron Williams, inspected the burned-out areas. Williams observed that tools and equipment he had previously seen in the garage were missing, that [Robinson's] insured wrecker which was usually parked in front of the truck stop had been destroyed in the fire, and that [Robinson's] uninsured race car which was normally kept in the garage had not been damaged. Williams also observed that the office area of the garage did not contain the remains of a color television, an adding machine, or a copying machine that [Robinson] later claimed he had lost in the fire.

Shortly thereafter, investigators discovered that a "tremendous amount" of fire accelerant had been poured on the floor where the fire had started and that a desk in the office area contained no files or debris of any kind.

During the next several weeks, [Robinson] requested salesmen with whom he dealt to prepare false invoices showing that he had purchased an air compressor and over $10,000 worth of tires so that he could submit them as part of his proof of loss to the insurance company.

Approximately a year later, on August 21, 1980, [Robinson's] house in nearby Clarksville, Tennessee was heavily damaged by arson about an hour after [Robinson] had left the premises with a large U-Haul truck filled with most of his household furnishings. Firefighters and investigators inspected the premises shortly after the blaze had been extinguished. They discovered that a large, two-handled cooking pot containing gasoline had been left on a lit stove, that an electric fan had been left running near an air vent, and that "rapid rise" gasoline had been spread throughout the house. They also determined that the doors and windows were locked, that the house was sparsely furnished, and that there was nothing in most dresser drawers or in any of the closets, except for empty hangers and a few garments in one closet. The authorities later learned that the home security system had been turned off and disconnected from the electrical system prior to the blaze.

During the month preceding the fire at his home, [Robinson] had packed family belongings, moved household furnishings from his house, and held a yard sale that was attended by several neighbors. [Robinson] explained to one neighbor that he was moving his family to California, but he told another neighbor that they were going there for a visit. Two or three days before the fire [Robinson] began loading his household furnishings into a large U-Haul truck with the help of a 17-year-old neighbor, Christopher Edwards. Edwards also helped [Robinson] move older furniture and appliances from the garage into the house. The day before the fire Edwards's 11-year-old brother saw [Robinson] draining gasoline from his race car into a large, two-handle [sic] cooking pot. During the early

---

* Footnotes and citations to the record have been omitted.

morning hours immediately before the fire, Edwards helped [Robinson] load the truck with clothing, beds, a grandfather clock, a dining room set, a master bedroom set, a microwave oven, and a double-door refrigerator-freezer filled with meat. Edwards remained with [Robinson] and his family until sometime after 3:00 a.m., when they were ready to leave for California. While Edwards and [Robinson's] family waited outside, [Robinson] remained alone in the house for five to ten minutes. After [Robinson] left the house, he and his family departed in the U-Haul truck and an automobile, and Edwards went straight home, arriving there between 4:00 and 4:30 a.m. Less than an hour later, neighbors discovered that [Robinson's] house was on fire.

Several weeks later [Robinson] contacted the company that insured his Clarksville house. He stated that his family had left Clarksville to vacation in California but that they had decided to remain there because of the fire. He provided the company with a list of property allegedly lost in the blaze. When he was interviewed by investigators the following month, he denied that he had set the fire to his Clarksville house or that he had removed clothing and most of the furnishings from the house. He explained that he had locked all the doors and checked that the stove and fans were off before leaving the house and that he had moved "some things" to California for his daughter who was attending college there. Subsequently, [Robinson] mailed the insurance company a proof of loss statement and a claim for $200,000, including a $106,500 personal property claim. Property that [Robinson] had removed from his Clarksville house and included in his insurance claim was later discovered by authorities in his California residence.

The evidence for the defense consisted of the testimony of two of [Robinson's] children and a neighbor concerning the events surrounding the fires and the various items left in Tennessee or taken to California and of a business associate that [Robinson] had been current in his business dealings and that [Robinson] said he intended to return

to Clarksville two weeks after going to California.