## LARRY RUDOLPH MARSHALL *v.* STATE OF MARYLAND

[No. 121, September Term, 1980.]

*Decided September 10, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Michael R. Braudes, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

COLE, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and RODOWSKY, JJ., dissent. SMITH, J., filed a dissenting opinion at page 214 *infra,* in which MURPHY,C. J., and RODOWSKY, J., concur.

In this case we shall determine whether the trial court abused its discretion when it admonished the appellant/witness to tell the truth or be prosecuted for perjury.

Larry Rudolph Marshall was tried and convicted of first degree murder by a jury and was sentenced to a term of 50 years by the Circuit Court for Worcester County. His conviction was affirmed by the Court of Special Appeals, *Marshall v. State,* 46 Md. App. 695, 420 A.2d 1266 (1980). We granted certiorari to consider the important issues presented.[1]

At Marshall's trial the State adduced evidence that on the night of February 9, 1979, the victim, Harry Waters, had been drinking in Dickie's Bar in Pocomoke City. At about 10 p.m., Waters left the bar and was joined by appellant and appellant's sisters, Barbara and Delores Marshall. On the corner of Clarke Avenue and Maple Street, outside the bar, appellant seized Waters from behind, whereupon, Delores and Barbara seized the victim's wallet and took his money. After the victim's empty wallet had been returned, appellant hit Waters in the face, which caused him to fall on the sidewalk and strike his head, rendering him unconscious. Appellant testified that he struck Waters only because Waters had threatened to "cut" him and had been reaching into a pocket.

At some point that evening, Peggy Marshall, another sis-

---

1. Because of the disposition we make in this case, it is unnecessary for us to address a second issue raised by appellant, namely, that it was error for the trial court to invoke a sequestration order to prevent a person from testifying on appellant's behalf where she was not a prospective witness when the order was issued and defense counsel became aware that she had relevant information only late in the trial.

ter of Appellant, saw the three perpetrators outside Dickie's Bar. Barbara said to Peggy that "they were messing with Harry Waters." The four of them, joined by Denise Trader, a friend of Peggy's, then walked around the corner to Maple Street where Waters was lying on his back. Delores poured water on him in an attempt to revive him, and a decision was then made to put Waters in his pick-up truck. Peggy testified that appellant made this decision; appellant testified that the suggestion was made by Peggy. Appellant and his sisters then placed Waters in his truck and returned to the bar. Waters was found unconscious in his truck the following morning and subsequently died as a result of his injuries and over-exposure.

Several days after the attack, appellant was picked up and transported to the Pocomoke City police station for questioning. He made a statement to Trooper D. Bruce Hornung which Hornung transcribed in longhand while appellant was speaking. At a pretrial hearing the court denied appellant's motion to suppress this statement, and at trial Trooper Hornung related it from his notes. Hornung testified that his notes reflected the following:

> In my notes taken on February the 12th I have got full name of Larry Randolph [sic] Marshall. His full description. And I go on that Larry, Barbara, and Delores — this is what Mr. Marshall was telling me — Larry, Barbara, and Delores were in Dickie's [Bar] after dark. Larry and Barbara went outside and Barbara went down the street to where Harry [Waters] was standing. Then I went down. He said he was going to give her some money. Larry held him from behind and Barbara took his wallet from his pants. She looked in his wallet and took the money out. Then she put his wallet back. We were walking back to the place and he was saying he was going to cut me. That's when I hit him and he slipped down. When I hit him — and in the margin I have got left side of face.
>
> What Mr. Marshall did, when he was talking to me, was indicate that he had used his right hand in a

swinging motion, like this, and struck Mr. Waters on the left side of his face (indicating).

When I hit him Barbara and Delores were there. Then Denise and Peggy came around the corner. Larry and Barbara and Delores carried him to his truck and Denise carried his hat. Put him in passenger side and put his key in pants pockets. Locked up truck and left. Sister said where vehicle was parked. Larry got $5.00.

On direct examination at trial, appellant's testimony concerning his participation in the robbery was similar to the statement related by Trooper Hornung, except for a few details. On cross-examination, when appellant was questioned concerning his oral statement, he indicated that Trooper Hornung had attributed words to him which he had not said and, when asked to be specific, Marshall stated he could not remeber, but that there was something in there he had not said. When counsel began asking appellant on a line-by-line basis whether appellant had made the statements reflected in Hornung's notes, appellant answered the first two questions, regarding his initial departure from Dickie's Bar, in the negative. The following colloquy ensued:

THE COURT: Just a minute.

MR. GROTON [Defense Counsel]: May I approach the bench, Your Honor?

THE COURT: Yes.

Madam Foreman, and ladies and gentlemen of the jury, will you retire to your room momentarily?

(Whereupon, the jury retired from the courtroom and the following proceedings ensued out of their hearing and presence:)

MR. MOORE [State's Attorney]: Your Honor —

THE COURT: Just a minute.

MR. MOORE: I would like to make a proffer before you say —

THE COURT: No, just a minute. Unless you don't want me to tell him.

MR. MOORE: I would.

THE COURT: Now, Mr. Marshall, you are under oath. If you fail to tell the truth, you can be charged with perjury. You took the witness stand in front of me the 13th of November.

THE WITNESS: Yes, sir.

THE COURT: With regard to the statement which you had given Trooper Hornung.

Now, during the course of that hearing you testified that you told him what had happened.

THE WITNESS: Yes, I did.

THE COURT: And I asked you if you told him the truth, and you said you did.

Now, this was after Trooper Hornung had testified precisely as he did in this case.

Now, you are trying now to testify differently from what you said on November the 13th, and I'll issue a bench warrant charging you with perjury if you persist.

All right, what do you want to say?

MR. MOORE: Would you advise him of the penalties of perjury?

THE COURT: I don't even remember, but you are disenfranchised for the rest of your life.[2]

\* \* \*

Now, ordinarily counsel cannot discuss the case with their client when the client is on cross-examination during a recess, but it's up to you, Mr. Moore.

Do you care if Mr. Groton talks to his client during the recess?

MR. MOORE: I wish he would.

THE COURT: Yes. All right.

2. It is possible that the appellant had no understanding of what this punishment would entail.

When cross-examination resumed appellant testified that Hornung's notes in fact accurately reflected the statement.

On appeal to the Court of Special Appeals appellant argued that the admonitions of the trial judge, which resulted in the change in defendant's testimony when the examination resumed, constituted error. The court rejected appellant's contention that the warnings were such as to deny him the right to present his defense and thus violated due process of law. We disagree.

First, it is apparent, upon a comparison of Marshall's testimony with the unsigned statement related at trial by Trooper Hornung, that there was some discrepancy in the details. Whereas Hornung's notes reflected that Marshall had left the bar and walked over to where the victim was standing, Marshall testified that they had left the bar together, and that Marshall had walked down the street right behind him. At no point, either at trial or at the suppression hearing, had Marshall testified that Hornung's notes accurately reflected the statement Marshall had given him. Merely, he had said, as the trial judge recalled correctly, that Marshall had "told him what happened." [3] Thus, there was no indication that Marshall was giving or was about to give testimony inconsistent with the substance of his own sworn statements, or that he was knowingly about to lie.

The real crux of the problem, however, lies in the admonition itself. Although this Court has never addressed

---

3. At the motion to suppress hearing, appellant had admitted that he made a statement to Trooper Hornung. The transcript of that proceeding thereafter reflects the following:

Q. [MR. GROTON, DEFENSE COUNSEL]: What did you say at that time?
A. [APPELLANT]: I had told him.
Q. Is that the time that you made your statement to him that he testified to?
A. It's the time that I — when I testified to him is when he said, "one way or the other I'll get it from you." That is when I told him.
Q. Okay.
THE COURT: Is what you told him the truth?
THE WITNESS: I told him what happened.

the problems which may arise when the trial court takes it upon itself to warn a witness or the defendant in a criminal case about the consequences of failing to testify truthfully, we find little difficulty in observing that whenever a court does so, it is swimming in treacherous waters. Preliminarily, as noted by the Supreme Court in *Webb v. Texas,* 409 U.S. 95, 97, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972) *(per curiam),* citing *United States v. Winter,* 348 F.2d 204, 210 (2nd Cir. 1965):

> Once a witness swears to give truthful answers, there is no requirement to "warn him not to commit perjury or, conversely, to direct him to tell the truth." It would render the sanctity of the oath quite meaningless to require admonition to adhere to it.

The Supreme Court in *Webb v. Texas, supra,* found no difficulty in holding that a trial court's admonition to a defense witness to refrain from lying, coupled with threats of dire consequences if the witness did lie, effectively drove that witness off the stand and deprived the defendant of his right to present a defense. The Court reasoned:

> The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected Mills to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole. At least some of these threats may have been beyond the power of this judge to carry out. Yet, in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind

as to preclude him from making a free and voluntary choice whether or not to testify. [409 U.S. at 97-98].

The State argues, and the Court of Special Appeals agreed, that *Webb* is distinguishable from the instant case. As reasoned by the court below,

[i]n the case at bar, the court cautioned the appellant only after he had begun to give testimony on cross-examination which was inconsistent with that which he had given on direct. Unlike the trial court in *Webb,* the court below did not expect the witness to lie. The court acted only after it appeared that the witness had in fact lied: unlike the *Webb* court, whose apparent purpose was to intimidate and to prevent the witness from testifying, the court below acted only to insure that the witness testified truthfully. [46 Md. App. at. 701].

We cannot agree. In the instant case an examination of the relevant testimony leads to but one conclusion, that the trial court *did* expect the defendant to lie, once he had related that there was something incorrect in Trooper Hornung's notes. At that point the defendant had not contradicted himself. The trial judge thus effectively conveyed to Marshall that if he were to testify in a manner contrary to Trooper Hornung's rather cryptic notes, he would be punished. We are faced, therefore, with a situation far different from cases such as *United States v. Nunn,* 525 F.2d 958 (5th Cir. 1976); *Brantley v. State,* 335 So. 2d 189 (Ala. App. 1976); and *People v. Davis,* 88 Ill. App. 3d 265, 43 Ill. Dec. 533, 410 N.E.2d 533 (1980), in which the warnings given were mild or neutral, and in all of which the witness had plainly contradicted a prior statement he had made under oath. *Cf. Dearing v. State,* 71 Ind. Dec. 211, 393 N.E.2d 167 (Ind. 1979).

The instant case, however, presents a problem even greater than that described in *Webb.* Not only are we concerned with the defendant himself, as opposed to some other witness, but we are also concerned with an admonition

which caused the defendant to testify in a certain way, out of fear that if he did not, he would suffer some severe, but unexplained consequence. In *Commonwealth v. Laws,* 474 Pa. 318, 378 A.2d 812 (1977), the Supreme Court of Pennsylvania reversed an appellant's convictions because the trial judge's admonitions, rather than simply conveying to the witness that he should tell the truth, directed him into adopting his previous testimony at the preliminary hearing. "The need to maintain impartiality," the court explained, "demands that the court exercise its authority with care, and refrain from questioning which may pressure a witness to testify in a particular way." 378 A.2d at 816. The appellant's conviction was reversed even though it was plain that the witness was attempting to recant statements he had made under oath at the preliminary hearings. *See Reese v. State,* 382 So. 2d 141 (Fla. App. 1980); *Hampton v. State,* 120 Tex. Crim. 158, 46 S.W.2d 314 (1932).

In sum, while we agree with the court below that a judge presiding over a jury trial has the right to interrogate witnesses in an effort to clarify the issues, we stress that he should exercise this right sparingly. It is a far more prudent practice for the judge to allow counsel to clear up disputed points on cross-examination, unassisted by the court. In this manner, the judge is most likely to preserve his role as an impartial arbiter, because he avoids the appearance of acting as an advocate.

Reasons abound for the trial court to proceed with extreme care when warning a witness about the penalties of perjury. First, it is the jury's function to assess the credibility of the witnesses and determine the facts from the evidence presented. When the judge unnecessarily warns a witness of the consequences of perjury, he may unwittingly change the course of the witness' testimony so that it jibes with the court's concept of what is true or is persuasive, or he may discourage the witness from testifying at all. Such a result infringes upon the defendant's Sixth Amendment rights to confront the witness against him and to present witnesses in his own defense. *See, e.g., Webb v. Texas, supra; State v.*

*Rhodes,* 290 N.C. 16, 24 S.E.2d 631, 638 (1976); *Commonwealth v. Laws, supra,* 378 A.2d at 851-56. Second, the defendant is entitled to present and conduct his defense unhampered by the judge's idea of what that defense is or how it should be presented. Third, the defendant's right to competent representation during the course of the trial should remain untrammeled. Perjury warnings may intimidate defense counsel as well as the defendant himself, thereby discouraging counsel from eliciting essential testimony from the witness. *E.g., State v. Rhodes, supra.* Last, and perhaps most fundamental, a defendant in every case, whether it is a jury trial or not, is entitled to an impartial judge. A defendant is plainly denied this right when the judge's participation in the trial stifles the defendant's ability to freely present all of the competent evidence available.

In the instant case, we hold that the admonitions of the trial judge unnecessarily affected the remainder of the appellant's testimony and thereby infringed upon his right to present a defense and to have the jury perform its function in resolving inconsistencies between the statement as recorded by Trooper Hornung and the defendant's own testimony at trial. The trial judge abused his discretion and the defendant's conviction cannot stand.

> *Judgment of the Court of Special Appeals reversed; case remanded to that court for reversal of the judgment of the Circuit Court for Worcester County and remand to that court for a new trial.*
>
> *Costs to be paid by Worcester County.*

*Smith, J., dissenting:*

The majority opinion states:

"In the instant case an examination of the relevant testimony leads to but one conclusion, that the trial court *did* expect the defendant to lie, once he had related that there was something incorrect in

Trooper Hornung's notes. At that point the defendant had not contradicted himself." (Emphasis in original.)

I see the matter somewhat differently.

The record relative to Trooper Hornung's testimony concerning the statement is as follows:

"A. In reading them, when I take notes to this effect, I sometimes use first person and sometimes use the third person so that I know when I go back to them later what I am talking about.

In my notes on February the 12th I have got full name of Larry Randolph Marshall. His full description. And I go on that Larry, Barbara, and Delores — this is what Mr. Marshall was telling me — Larry, Barbara, and Delores were in Dickie's after dark. Larry and Barbara went outside and Barbara went down the street to where Harry was standing. Then I went down. He said he was going to give her some money. Larry held him from behind and Barbara took his wallet from his pants. She looked in his wallet and took the money out. Then she put his wallet back. We were walking back to the place and he was saying he was going to cut me. That's when I hit him and he slipped down. When I hit him — and in the margin I have got left side of face.

What Mr. Marshall did, when he was talking to me, was indicate that he had used his right hand in a swinging motion, like this, and struck Mr. Waters on the left side of the face (indicating).

When I hit him Barbara and Delores were there. Then Denise and Peggy came around the corner. Larry and Barbara and Delores carried him to his truck and Denise carried his hat. Put him in passenger side and put his key in pants pocket. Locked up truck and left. Sister said where vehicle was parked. Larry got $5.00.

"Q. That was the statement that the Defendant made to you?

"A. That is correct."

On direct examination Marshall related the departure of the parties from the tavern, their starting down the street, and the fact that the parties stopped. He then was asked what happened next. The record reflects in relevant part:

"A. Well, like Harry Waters, he stopped and he turned around and he said to me, he said, 'Boy, what you following me for?' Like that.

And I told him I wasn't following him. And he said, 'Boy, what you following me for?' Like that. He said, 'You better get somewhere before I cut you.' And —

"Q. When he said this where was Barbara?

"A. She was standing nearby.

* * *

"Q. Where were you in relation to Harry Waters?

* * *

"A. . . . I would say about here from the end of this right here (indicating).

"Q. Okay. Were you facing each other or was his back to you, or how were you positioned?

"A. No, he was kind of sideways to me.

"Q. Kind of sideways to you.

Which side was towards you?

"A. Which side of him?

"Q. Yes.

"A. It was the left side.

"Q. Left side. Okay.

Now, did anything happen when he said this to you, when he said, 'You better get somewhere. I am going to cut you.' Is that what he said?

"A. Yes.

"Q. Did anything happen at this point?

"A. Like when he said that, that's when I grabbed him.

"Q. How did you grab him?

"A. Like he was standing on his side of me. I grabbed him like that (indicating).

"Q. Okay. You put your arms around him. Is that what you are demonstrating?

"A. Uh-huh.

"Q. Is that like a bear hug?

"A. Well, —

"Q. Were your arms completely around him? Is that what you are showing?

"A. He was standing on his side operating from his side like this (indicating).

"Q. Now, what happened at that point?

"A. Well, at that point that's when my sister, Barbara, had took his wallet out.

"Q. What did she do with that?

"A. She took out $20.00, what he had in there.

"Q. And what happened at that point?

"A. And at that point Delores, she had took $2.00 [sic] out of his pocket.

"Q. Were you holding him during this time?

"A. Was I holding him at that time?

"Q. Yes.

"A. I don't think so. I think I let him go.

"Q. How long did you hold onto him?

"A. Oh, about seven seconds, eight seconds?

"Q. Did he say anything at this time?

"A. No, he didn't.

"Q. Now, what did Barbara do with the wallet?

"A. Like, she give it back to him because he said, told Barbara that for her give his wallet back to him. All he wanted was his wallet with his license in it."

The transcript reflects that Marshall said Waters told Barbara to give him his wallet and that she could keep the $20.00, and that the wallet then was returned. Then the record shows:

"Q. What happened next then?

"A. Well, we started walking back up towards Dickie's Bar.

"Q. Okay.

And when you say, 'we,' who is we?

"A. Me, Barbara, and Delores and Harry.

"Q. What were the positioning again as you were walking back to Dickie's?

"A. Like me and Harry, we was walking in front of Barbara and Delores, and they were in back of us.

"Q. You were side-by-side?

"A. Well, —

"Q. With Harry?

"A. Yeah, you could say that we were side-by-side.

"Q. Was he saying anything to you?

"A. Yes, before we had got up to the bar he told me again, he said, 'Boy, what you following me for.' Like that. He said, 'You better get somewhere before I cut you.' Like that. And he reached in his pocket. That is when I hit him on the left side of his face under his chin.

"Q. Okay. What hand did you hit him with?

"A. With my right hand.

"Q. Did you hit him on the left side of the face?

"A. Yes, I did.

"Q. And what happened at that point?

"A. Well, at that point he had slipped down and fell and he hit his head.

And, like, after that, Peggy and . . . no, after that Peggy had come up on the corner and we went over there where she was.

"Q. And what happened at that point?

"A. And like she asked Barbara what was wrong.

"Q. And did Barbara say anything?

"A. Barbara told her that Harry Waters say he was going to cut me and I hit him.

"Q. Okay. Now, at this point you were up on the corner of what street?

"A. Clarke Avenue.

"Q. Clarke Avenue. And what was the other street?

"A. Maple.

"Q. Maple. Where was Harry Waters?

"A. He was laying down on the ground.

"Q. And how far from him were you?

"A. Oh, about ten yards or ten feet, something like that."

The transcript then refers to the fact that Delores got a glass of water which she poured on Waters' face, that he appeared to have been "unconscious for a few minutes," and after this he moved. The record then states:

"Q. And what happened at that point?

"A. And at that point Peggy said, 'Why don't you all take Mr. Harry Waters to his truck.'

"Q. Did you do anything at that time?

"A. Yes, I helped him up. Me and my sister, my sister, Barbara and Delores, and we were taking him to his truck, and before, as we were going through that little alleyway he said, he asked us where were we taking him, and we told him we were taking him to his truck.

"Q. Did you take him to the truck?

"A. Yes, we did.

"Q. What did you do when you got there?

"A. Like, I went to the passenger side and tried to open the door but I guess it was locked. So I went around to the passenger side and that door was

locked. So, then, I come back, I come back around where him and my sister was, around to the passenger side, and I took his keys out of his pocket and I went to the driver's side and got in that door, because I tried to open the passenger side but that door wouldn't open. So I got in and went around to the driver's side. I slid across his seat and opened the passenger side of the door from the inside.

"Q. Okay. And what did you do at that point?

"A. And at that point me and my sister, Barbara and Delores, we put Harry Waters in his truck.

"Q. How did you put him in there?

"A. Well, Delores and Barbara put his legs in and I held him by his shoulders.

"Q. Okay. Now, did you put him on the seat?

"A. Yes, we did.

"Q. How was he positioned on the seat?

"A. He was sitting up just like I am now.

"Q. Was he moving?

"A. Yes, he was.

"Q. Did he say anything to you?

"A. He asked us where was he and I told him we had put him in his truck.

"Q. Did he say anything after that?

"A. No, he didn't.

"Q. What did he do at that point?

"A. At that point I locked the passenger side door and then we left, after Denise put his hat in the truck.

"Q. All right. You locked the passenger side of the door.

"A. Right.

"Q. Did you lock the driver's side of the door?

"A. Well, when I went to the driver's side of the door, I opened it. And as soon as I opened it I got in

his truck and I just slid across his seat. No, I am
quite sure that I didn't lock the door."

It thus will be seen that out of the lips of Marshall on his
own direct examination came virtually the same words
which were contained in Trooper Hornung's notes. On
cross-examination, much the same information was
developed. The prosecutor on cross-examination brought out
the fact that although Marshall said he grabbed the victim
because of his fear of being cut, he let him go after about
seven seconds without leaving the scene. This prompted a
question as to whether Marshall "expect[ed] anybody to
believe what [he] ha[d] just said." The prosecutor then
developed that although everything was removed from
Waters' pockets and Marshall himself went into the pockets
after keys to the pickup, Marshall at no time saw any knife.
Then that which provoked the admonition of the trial judge
appears as follows on cross-examination:

"Q. . . . Now, you remember Trooper Hornung,
don't you?

"A. Yes, I remember him.

"Q. All right.

Now, you gave him a statement, didn't you?

"A. Yes, I told him a few words.

"Q. Beg your pardon?

"A. Yes, I told him some words.

"Q. You told him what he said to the jury you told
him, isn't that right?

"A. I *told him part of it. I didn't tell him all of it.*
[(Emphasis added.)]

"Q. All right.

Now, so Trooper Hornung was not being truthful
to the jury when he was testifying, is that correct?
Is that correct?

"A. Yes.

"Q. That is correct, Trooper Hornung was lying
to the jury?

"A. Well, he could have been and he couldn't have.

"Q. Larry, don't — look, son, —

"A. He had told me when he got up there, he said he was going to tell me what Barbara and Delores told him.

"Q. Okay. And then you told him what he wrote down on that page, didn't you?

"A. Not some of it.

"Q. What didn't you tell him?

"A. I can't remember, but it's something in there that I didn't tell him, I know that.

"Q. What did you tell him then? Do you remember what you did tell him as opposed to what you didn't tell him?

Let me ask you specifically. Did you say to Trooper Hornung that you and Barbara went outside and Barbara went down the street to where Mr. Waters was standing? Did you tell him that?

"A. No, I didn't.

"Q. Did you tell him that you followed her down the street?

"A. Told him what?

"Q. Yes.

"A. No, I did not."

I think the trial judge did not "*expect* the defendant to lie, once he had related that there was something incorrect in Trooper Hornung's notes"; he knew the defendant had lied. (Emphasis added.) Under that circumstance, I think the admonition was entirely proper. When the witness returned to the stand after the admonition and testified, "Well, when I realized, and think about it, I think what is on that piece of paper is what I told him," he was merely confirming that which he himself had already said on direct and cross-examination. It is apparent that he realized the difficulty he was in because he said he had grabbed Waters

because of a threat by Waters to cut him but he had been obliged to admit that he saw no signs of a knife. It was then that he attempted to challenge the statement as taken down by Trooper Hornung.

I think Judge Thompson was absolutely right when he said for the Court of Special Appeals in *Marshall v. State,* 46 Md. App. 695, 420 A.2d 1266 (1980):

> "We find the instant case and *Webb* [*v. Texas,* 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972),] to be in no way analogous. In *Webb,* the trial court delivered its admonition before the witness had begun to testify; as the Supreme Court stated: '[T]he judge implied that he expected [the witness] to lie. . . .' *Id.* 409 U.S. at 97. In the case at bar, the court cautioned the appellant only after he had begun to give testimony on cross examination which was inconsistent with that which he had given on direct. Unlike the trial court in *Webb,* the court below did not expect the witness to lie. The court acted only after it appeared that the witness had in fact lied: unlike the *Webb* court, whose apparent purpose was to intimidate and to prevent the witness from testifying, the court below acted only to insure that the witness testified truthfully." [*Id.* at 701.]

Hence, I would affirm.

Chief Judge Murphy and Judge Rodowsky authorize me to say that they concur in the views here expressed.