848 A.2d 660

James **JOHNSON**

v.

**STATE of Maryland.**

**No. 192, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

May 3, 2004.

696

Lisa J. Sansone (Roland Walker, on the brief), Baltimore, for Appellant.

Zoe Gillen White (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DEBORAH S. EYLER, ADKINS, and THEODORE G. BLOOM (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

A jury in the Circuit Court for Baltimore City convicted James Johnson, the appellant, of second degree murder, use of a handgun in a felony or crime of violence, and wearing, carrying, or transporting a handgun. He was found not guilty of first degree murder. The court sentenced the appellant to a 30–year prison term for the second degree murder conviction, and to a consecutive term of 20 years in prison, the first five years without the possibility of parole, for the use of a handgun conviction. The wearing, carrying, or transporting a handgun conviction was merged into the use of a handgun in a felony conviction.

On appeal, the appellant presents five questions for review, which we have reordered and rephrased:

I.  Did the trial court err by denying a defense motion for mistrial or curative instruction made after the trial judge questioned a witness and elicited testimony that, after arrest and before trial, the appellant was trying to reconcile with his estranged wife so she would not elect to testify?

II.  Was there sufficient evidence to sustain the convictions?

III.  Did the trial court err by admitting into evidence highly prejudicial hearsay testimony?

IV.  Did the trial court err by stating that the appellant "may have remained silent" and allowing the jury to consider whether his alleged silence constituted an admission of guilt?

V.  Did the trial court err in instructing the jury as to second degree murder?

We answer Questions I and II in the affirmative. On that basis, we shall reverse the appellant's convictions and remand the case for a new trial. We do not reach the appellant's other three issues.

## FACTS AND PROCEEDINGS

On November 4, 2001, at about 4:30 p.m., a man broke into the Baltimore City apartment of Mary Blake Johnson ("Mary"), the appellant's estranged wife, and shot and killed her boyfriend, Matthew Boyd, in her presence. Mary called 911. She told the police who responded to the scene that "someone had broke in" and shot Boyd.

When the shooting happened, three teenaged boys were standing on the street, outside Mary's apartment building. All three boys testified at trial that they heard shouting from inside the apartment, and then heard a woman yell, "No, stop!" That was followed by a loud bang. A minute or two later, they saw a man leaving the apartment. Two of the boys testified that the man was holding the waistband of his pants in a manner that suggested he was carrying a weapon under his clothes. All three boys testified that the man got into a very distinctive-looking automobile—a "bright green turquoise" Mercury Sable with dents in the driver's side door and missing its driver's side mirror—and drove away. Within a few minutes, the man returned in the same vehicle and reentered the apartment building. After a few minutes, he left the building for a second time and drove away in the same car.

The teenagers did not get a close look at the man's face. At trial, none of them could positively identify the appellant as the man seen entering and leaving Mary's apartment building. Each provided a description of the man's complexion, height, weight, and build that was consistent with the appellant's physical appearance, however.

Antonio Johnson ("Antonio"), the appellant's brother, testified at trial that the appellant came over to his house in the early afternoon on November 4, 2001, to help him fix his car.

The appellant left a few hours later, and did not say where he was going. Later that afternoon, the appellant called him and kept repeating that he was in trouble; he did not say why, though. According to records admitted into evidence, the appellant's telephone call to Antonio was made by cell phone at 4:51 p.m.

Constance Calloway was the appellant's long-time girlfriend. She and the appellant were involved in a romantic relationship before he married Mary, and the relationship continued after the marriage and during the estrangement. The appellant had children by both women.

Calloway testified that the appellant stayed at her house on the night of November 3, 2001, and left early the next morning. Sometime between 10 p.m. and 11 p.m. on November 4, the appellant called Calloway and said "he had just done something that may send him to jail for the rest of his life."

The day after the murder, a warrant was issued for the appellant's arrest. The police could not find the appellant, however, and it appeared that he was in hiding. On December 8, 2001, the appellant's turquoise green Mercury Sable, which fit the description of the distinctive-looking car seen outside Mary's apartment building when the murder happened, was found abandoned two blocks from Antonio's house. Two months later, on February 18, 2002, the appellant voluntarily turned himself in to police.

We shall recite additional facts as pertinent to our discussion of the issues.

## DISCUSSION

### I.

The State's theory of prosecution was that, when Mary became romantically involved with Matthew Boyd, after years of putting up with the appellant's infidelities, most notably with Calloway, the appellant became jealous, and decided he and Mary should reunite. Mary chose Boyd over him, though, and the appellant retaliated by killing Boyd. The defense's

theory of the case was that the appellant was not the shooter and was not motivated to harm Boyd, as the State contended, because he had not been trying to reunite with Mary.

Before trial, Mary invoked her spousal privilege not to testify, under Md.Code (1974, 2002 Repl.Vol.), section 9–106 of the Courts and Judicial Proceedings article ("CJ"). Without Mary's testimony, the State's evidence that the appellant was the shooter was entirely circumstantial. In her opening statement, the prosecutor told the jury that Mary would not be testifying at trial, because she was "unavailable."

Constance Calloway was a "double-edged" sword of a witness. Her testimony that the appellant called her on the night of the murder and said he had done something that might "send him to jail for the rest of his life" was an important piece in the State's puzzle of circumstantial evidence. The defense tried to impeach her on this testimony by showing that she had been spurned by the appellant, and so was motivated to invent damaging testimony about him. That line of attack had drawbacks for the defense, however, because it tended to support the State's theory that Mary was the appellant's primary love interest. On the other hand, Calloway's testimony was helpful to the defense because she was protective of her relationship with the appellant, and made it plain that their romantic involvement never waned and he did not chose Mary over her.

The first question presented concerns testimony elicited from Calloway by the trial judge, on redirect examination.

On direct, the prosecutor questioned Calloway about any contact she had had with the appellant after the day of the murder. Apparently, the questions were asked in an effort to show that, after the arrest warrant was issued, the appellant cut off his usual contact with friends and family to hide from police. Calloway testified that, on November 7 and 8, she spoke to the appellant on his cell phone and that he asked her during the conversations not to call him at that number again. She further testified that she did not see him or speak to him thereafter, which was "unusual."

On cross-examination, defense counsel sought to elicit that Calloway was upset that the appellant did not contact her for several months after the murder, *i.e.*, that she felt rejected by him. In response to questions by defense counsel, Calloway testified that, after the appellant turned himself in to the police, she tried to visit him in prison three times, once with success. Defense counsel had Calloway read to the jury a letter she had sent to the appellant while he was in prison awaiting trial, in which she wrote, "we can't see each other." Then, in what seems to have been an attempt to impeach Calloway by pointing out the discrepancy in her testimony as to whether or not she had seen the appellant after his arrest, defense counsel asked the following question, and the following response was elicited:

> [DEFENSE COUNSEL]: Now, I'm particularly interested in your comment there [in the letter] we can't see each other. Didn't you just tell the members of our jury that you had been over there three times and saw him[?]
>
> CALLOWAY: Yes, I did and when I was there he asked me not to come back to see him *because it would mess things up with him and Mary as far as her testifying.*

(Emphasis added.) Defense counsel chose not to pursue any follow-up questions.

On redirect, the following colloquy took place:

> [PROSECUTOR]: You also indicated on cross-examination that you purposefully kept your distance from the defendant and didn't visit with him unless and until he asked you because you didn't want to mess things up between him and Mary, or words to that effect, do you recall that?
>
> CALLOWAY: That's correct.
>
> [PROSECUTOR]: Do you recall exactly what you said?
>
> CALLOWAY: I don't recall exactly what I said but [the appellant] did, you know, inform me during the time that when I went to see go see him that he didn't want Mary and I to bump heads because during the time that I was there that's around the time that she usually would, you know, get there or she gets there around about twelve-

thirty or whatever time as I was leaving, however that went and, you know that was it.

[PROSECUTOR]: Well, did he tell you why he was attempting to reconcile with his wife at that point?

CALLOWAY: I didn't even ask him the question.

The trial judge interjected at that point:

THE COURT: Did [the appellant] indicate to you whether or not he had a specific reason not to get on [Mary's] bad side while he was incarcerated?

CALLOWAY: He did in so many words. It was—how did he say it? He said hmm—

THE COURT: What was the gist of what he said?

CALLOWAY: These are not the words that he said but however it went, *it was so that she did not end up testifying against him that he committed this crime, but those were not the words that he used, but somewhere around in there like that.*

(Emphasis added.)

Defense counsel immediately moved for a mistrial, which the trial court denied, and then requested a curative instruction to the jury to disregard Calloway's response to the court's question. The trial judge denied the request, saying that on cross-examination Calloway had alluded to the appellant's reconciling with his wife so she would be willing to invoke her spousal privilege not to testify, and that the court's questions were posed merely as a means to have Calloway clarify that testimony.

At the close of the evidence, the trial court instructed the jurors that Mary had not been available to testify at trial and they were not to speculate about what she would have testified to had she been available.

On appeal, the appellant contends the trial court abused its discretion in denying his motion for mistrial and, alternatively, his request for a curative instruction. He maintains that the trial judge's stated premise for questioning Calloway as he did, that the issue of the appellant's motive for trying to be on

Mary's "good side" before trial had been raised on cross-examination, was in error, and that the judge exceeded the exercise of sound discretion by questioning Calloway on the issue. He further argues that the judge's questions elicited prejudicial testimony about the reason that Mary was not testifying at trial.

The State's response is two-fold: first, the issue of whether the appellant was trying to stay out of trouble with Mary so she would not testify against him was raised on cross-examination by defense counsel, and therefore was not preserved for review; second, the trial judge acted within his discretion in questioning Calloway to clarify her testimony, and therefore did not abuse his discretion by denying the mistrial motion or request for curative instruction.

■ There is no merit to the State's non-preservation argument. To be sure, Calloway first made mention of "Mary's testifying" in answer to the question, posed on cross-examination, whether she just had testified, on direct, that she in fact saw the appellant after he was arrested, in prison. Her answer was not responsive to the question posed, however, and could not have been anticipated by defense counsel, who changed the topic of inquiry immediately. Therefore, it cannot be argued that defense counsel raised the issue on cross-examination, and thereby failed to preserve the issue for appeal. *See Brown v. State,* 373 Md. 234, 238, 817 A.2d 241 (2003) (restating the long-held principle that " 'a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted' ")(quoting *Ohler v. United States,* 529 U.S. 753, 755, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000)); *Mills v. State,* 310 Md. 33, 69, 527 A.2d 3 (1987), *judgment vacated on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (holding that a defendant could not later complain of the inadmissibility of evidence that he had introduced on direct examination). Moreover, the focus of the appellant's contention on appeal is that the trial judge abused his discretion by eliciting improper and prejudicial testimony from Calloway, something that occurred later during the

State's redirect examination of Calloway, and to which the appellant immediately reacted by moving for a mistrial.

Before addressing the substance of the issue raised by the appellant, and the State's response, we shall review the governing legal principles.

"Whether to order a mistrial rests in the discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion. The question is one of prejudice." *Med. Mut. Liab. Ins. Soc'y of Md. v. Evans*, 330 Md. 1, 19, 622 A.2d 103 (1993) (citations omitted). *See also Lai v. Sagle*, 373 Md. 306, 818 A.2d 237 (2003); *Klauenberg v. State*, 355 Md. 528, 555, 735 A.2d 1061 (1999). In a jury trial, when a mistrial was requested on the basis that improper evidence was put before the jury, and the motion was denied, "we must determine 'whether the evidence was so prejudicial that it denied the defendant a fair trial.'" *Evans, supra*, at 330 Md. at 19, 622 A.2d 103 (quoting *Rainville v. State*, 328 Md. 398, 408, 614 A.2d 949 (1992)). When the court denied the motion but gave a curative instruction, the question of prejudice becomes whether " 'the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.'" *Id.*

A judge presiding over a jury trial may interrogate the testifying witnesses in an effort to clarify the issues in the case. *Marshall v. State*, 291 Md. 205, 213, 434 A.2d 555 (1981). It is not improper " 'for a trial judge presiding at a jury trial to examine a witness on matters admissible in evidence . . .' where . . . the prior testimony is unclear, evasive or equivocal." *Lane v. State*, 60 Md.App. 412, 429, 483 A.2d 369 (1984) (quoting *Sim–Kee Corp. v. Hewitt*, 13 Md.App. 296, 299, 282 A.2d 525 (1971)). This is so even when the examination produces evidence that is damaging to the defendant. *See Lane, supra*, 60 Md.App. at 429–30, 483 A.2d 369.

A judge should exercise the prerogative to question witnesses "sparingly," however, *Marshall, supra*, 291 Md. at 213, 434 A.2d 555, so as to avoid the risk of appearing partial,

and thereby prejudicing the rights of the parties to a fair trial, that is, one before a neutral arbiter. In *Leak v. State*, 84 Md.App. 353, 362, 579 A.2d 788 (1990), in which this Court held that the judge presiding over a jury trial "assumed a prosecutorial role by questioning a key defense witness in such a manner as to display disbelief in that witness's testimony," so that a mistrial was mandated, we explained:

> The extent to which a trial judge should or may intervene to question a witness . . . involves the drawing of a fine line between assisting the jury by bringing out facts and "sharpening the issues," which is permissible, and influencing the jury's assessment of facts or of a witness's credibility by indicating his own opinions, which is not permissible.

*Id.* at 363–64, 579 A.2d 788.

In criminal cases, Maryland law recognizes a spousal adverse testimony privilege. The privilege is set forth in CJ section 9–106, which states that, with some exceptions not pertinent here, "[t]he spouse of a person on trial for a crime may not be compelled to testify as an adverse witness[.]" The purpose of the privilege is to maintain and foster the marital relationship. McLain, *Maryland Evidence,* § 505:1, at 149 (2001). To that end, the privilege is held "by the potential witness who is called to testify for the state in a criminal prosecution of his or her present spouse." Murphy, *Maryland Evidence Handbook,* § 903, at 374 (1999). *See also Ashford v. State,* 147 Md.App. 1, 60, 807 A.2d 732 (2002); *Hagez v. State,* 110 Md.App. 194, 207, 676 A.2d 992 (1996). The privilege belongs to the witness spouse, not the defendant spouse, because its purpose only is furthered when the witness spouse is willing to invoke it; if a spouse is willing to testify against the other spouse in a criminal case, there is no viable marital relationship worth protecting. McLain, *supra,* § 505:1, at 149.

A claim of privilege by a witness is not a permissible basis on which to infer the answer the witness would have given. *United States v. Maloney,* 262 F.2d 535, 537 (2d Cir.1959) (Hand, J.). In some circumstances, a witness's

invocation of a privilege in a criminal jury trial will give rise, naturally, to an inference by the jurors that, had the witness testified, his testimony would have been adverse to the defendant. *Somers v. State*, 156 Md.App. 279, 298–99, 846 A.2d 1065 (2004).

Our Court of Appeals has held, in the context of the federal constitutional privilege against compelled self-incrimination that, ordinarily, when the prosecutor knows the witness will invoke the Fifth Amendment when called, it is improper for the State to call the witness before the jury to invoke the privilege so as to take advantage of the adverse inference the jury naturally will draw from the assertion. *Allen v. State*, 318 Md. 166, 179–80, 567 A.2d 118 (1989). *See also Adkins v. State*, 316 Md. 1, 14–15, 557 A.2d 203 (1989) (finding prejudicial error when the State called an accomplice in a murder case against the defendant, knowing he would invoke his Fifth Amendment privilege, ostensibly to establish his unavailability for purposes of hearsay exception rule); *Vandegrift v. State*, 237 Md. 305, 309, 206 A.2d 250 (1965) (holding that it was prejudicial error for the prosecutor to call untried co-defendants to the witness stand, knowing they would invoke their Fifth Amendment privilege, and for the purpose of having them do so, so the State could argue an adverse inference from the invocation, which could then be transferred to the defendant by proof of his association with the co-defendants). The reason for a general rule against the State's calling a witness, knowing he properly will invoke the Fifth Amendment, so as to impress the invocation upon the jury, is to guard against the State's building its case based on improper inferences drawn from a claim of privilege, instead of on actual evidence of wrongdoing. *See Vandegrift, supra,* 237 Md. at 308–09, 206 A.2d 250.

On the same principle, the court in *United States v. Chapman*, 866 F.2d 1326, 1333 (11th Cir.1989), held that, "as a general matter it is improper to permit a witness [spouse] to claim a testimonial privilege in front of the jury where the witness's intention not to testify is known beforehand." Likewise, in *San Fratello v. United States*, 340 F.2d 560, 566 (5th

Cir.1965), which was decided when the federal common-law spousal adverse testimony privilege was interpreted to allow the witness spouse *or* the defendant spouse to claim the privilege, the court held that the prosecutor could not call the defendant for the purpose of having him claim the privilege in front of the jury.[1] *See also Kiefer v. State,* 297 Ark. 464, 762 S.W.2d 800 (1989) (noting that asking questions which are designed to elicit a claim of privilege from a witness "creat[es] the equivalent of testimony in the minds of the jurors"); *Price v. State,* 175 Ga.App. 780, 780, 334 S.E.2d 711 (1985) (holding that, once the spouse of a defendant has invoked the privilege against being compelled to testify against the defendant spouse, that election must be made outside of the jury's presence); *Commonwealth v. Labbe,* 6 Mass.App.Ct. 73, 80, 373 N.E.2d 227 (1978) (observing that, when it is clear that if the defendant's spouse is called to testify, the spouse will invoke the adverse testimony privilege, either the witness should not be called or the questions that will result in the privilege's being invoked should not be asked in front of the jury).

In the same vein, in *United States v. Morris,* 988 F.2d 1335, 1337 (4th Cir.1993), the court held that it was reversible error for a prosecutor to ask the defendant's wife, who was testifying as a defense witness at trial, about the fact that she had claimed the spousal adverse testimony privilege when called to testify before the grand jury. Observing that, while the privilege is not constitutionally based, "marital silence offers the same protection as does Fifth Amendment silence[,]" *id.* at 1339, the court reasoned that "[t]he inference that a wife remained silent before the grand jury because she knew information that would inculpate her husband is one the jury is likely to draw." *Id.* at 1340. The court explained:

---

1. In *Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Supreme Court modified *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), in which it had held that the federal privilege for adverse spousal testimony barred the testimony of one spouse against the other unless both consented.

The prosecutor's cross-examination of [the defendant's wife] about her invocation of the privilege is bound to have had as a purpose to infer that she would have testified before the grand jury if she had something exculpatory to say. To permit such an inference would destroy the privilege.

*Id.* at 1341.

■ In the case at bar, it was known to the parties before the start of trial that Mary had invoked the spousal adverse testimony privilege. It was uncontested, and the evidence established, that Mary was present in the apartment when the murder was committed, cried out, and called 911. The contested issue in the case was criminal agency—was the appellant the shooter?—and, as the only eyewitness to the shooting, Mary most certainly knew the answer to that question.

Under the circumstances, if the jurors were told that Mary was not testifying as a witness because she had invoked her privilege, as the appellant's wife, not to testify, they inevitably would have drawn the impermissible and stigmatizing inference that her testimony would have inculpated the appellant—otherwise, she would have testified in order to help him. To obviate that problem, it was important that the fact of Mary's having invoked her claim of privilege not be put before the jury.

Calloway's remark, on cross-examination, that the appellant asked her not to come back to see him in prison *"because it would mess things up with him and Mary as far as her testifying"* communicated, albeit vaguely, two thoughts relating to the spousal adverse testimony privilege: 1) that Mary, unlike other witnesses in the case, had a choice about whether to testify, *i.e.,* that she had a right not to testify; and 2) that the appellant wanted Mary to chose not to testify. Because Calloway's remark was vague, was an offhand add-on to a non-responsive answer to a question, and was not pursued by defense counsel, it is unlikely, however, that the jury gained an understanding from it that Mary's absence from the trial was a product of choice exercised by right.

Unfortunately, the trial judge's follow-up questions to Calloway on redirect examination clarified that precise point. The questions elicited from Calloway in the plainest of terms that the appellant was ingratiating himself to Mary before trial so she would opt not to testify against him. The jurors had to have known from that clarified testimony that Mary was entitled not to testify against the appellant if she so chose, based on their relationship of husband and wife; and most certainly they would have concluded that Mary's exercising that choice accounted for her absence.

To be sure, Calloway's testimony, on cross-examination, alluding to Mary's right not to testify, was vague, and presiding judges at jury trials may question witnesses to clarify testimony that is vague. That discretion should not be exercised to clarify vague testimony on a topic that should not be put before the jury to begin with, however. Particularly in the circumstances of this case, in which the accused's wife was the only eyewitness to the crime and was not testifying, it was critical that the jurors *not know* that she had chosen not to testify, because, once they knew that, they would think that she would have identified him as the shooter. It was an improper exercise of discretion for the trial judge to pose questions that would elicit answers making it obvious that Mary had a choice not to testify, and therefore equally obvious that her absence from the trial was a product of her own choice.

It is evident from the questions posed by the trial judge that their primary purpose was to elicit a damaging implied admission to the crime by the appellant, not to clarify Calloway's vague "Mary testifying" remark. The point of the examination by the judge was to have Calloway explain to the jury that the appellant was getting on Mary's "good side" before trial so she would not testify against him at trial, from which the jury could conclude that he knew Mary's testimony would incriminate him. In that respect, the questions were over-the-line in their prosecutorial nature. They were meant to influence negatively the jury's assessment of the appellant's guilt, not to put in clear focus the factual issues the jury was

to decide. In addition, the implied admission of guilt they were meant to and did elicit was not properly admissible, because it merely was a variation on an impermissible adverse inference from the spousal adverse testimony privilege. In that regard, *Courtney v. United States,* 390 F.2d 521 (9th Cir.1968), which is factually similar to the case at bar, is instructive.

In *Courtney,* the defendant was charged with, among other crimes, violating the Mann Act, 18 U.S.C. 2422 (2000), by knowingly transporting two women over state lines, from Los Angeles, California, to Las Vegas, Nevada, for purposes of prostitution. One of the women was Beverly Caputo, also known as "Renee Dubeau." After the defendant was charged, but before trial, he and Caputo were married.

Caputo did not testify at trial. The defendant testified on his own behalf, and on cross-examination was asked whether it was true that he had married Caputo so the government could not call her as a witness at trial. An objection to the question was sustained. The prosecutor then called on rebuttal a woman named Kathy Lamonte, and asked her about a conversation she had had with the defendant, after his arrest but before trial, in which he said he was going to marry Caputo, so she would not testify against him:

Q. Did the defendant say anything to you with reference to Renee and marrying Renee?

A. Oh. He said he was going to marry her.

Q. Did he say why?

A. I believe to keep her from testifying against him.

Q. Is that what the defendant said to you?

A. Yes.

390 F.2d at 528. The defendant immediately moved for a mistrial, which was denied.

On appeal following conviction, the defendant argued that Lamonte's testimony was improper impeachment evidence that was prejudicial to him, and that the trial court therefore abused its discretion in denying his mistrial motion. The

appellate court agreed: "In our view, the questions were deliberately asked [by the prosecutor] and the answers fully expected, *the effect of which was to destroy the spousal privilege and was prejudicial to the [defendant]." Id.* (emphasis supplied). The court further explained:

> [W]e are satisfied that the only purpose that Government counsel had in mind in asking the questions ... concerning the marriage was to leave the impression with the jury that if Beverly Caputo had been called as a witness, her testimony would have been favorable to the Government.

*Id.* at 529.

Likewise, in the case at bar, the reason the trial judge asked the questions he did of Calloway was to elicit information that would effectively undermine the spousal adverse testimony privilege, by showing that the appellant wanted Mary to invoke the privilege, and therefore showing that her testimony would have been unfavorable to him. The questions would have been improper had they been asked by the prosecutor, and should not have been asked by the judge.

In this case, in which the central issue was the identity of the shooter, the prejudice to the appellant from Calloway's testimony in answer to the trial judge's questions is clear. The jurors were given enough information to have in their minds that, had the only eyewitness to the crime testified, she would have identified the appellant as the shooter. That information most certainly would have affected the jury's decision in this case, adversely to the appellant.

On the issue of prejudice, the State points out that, even though the court refused to give a curative instruction immediately after the mistrial motion was denied, at the conclusion of the evidence, it instructed the jury, as we have noted, that Mary was not available to testify, and the jurors should not speculate from that about what her testimony would have been. The instruction that was given could not have cured the prejudice that was caused by the judge's questioning of Calloway, however.

The purpose of such an instruction is to give the jurors the impression that the spouse's absence from trial is a neutral event, not of any party's choosing, so the jurors will not attach a significance to it that is adverse to either party.  Here, the instruction was requested by the State, most likely to eliminate any possible speculation by the jurors that the State's failure to call Mary meant Mary would not have supported the prosecution's case.  *Cf. United States v. Gernie*, 252 F.2d 664, 669 (2d Cir.1958).  By the time the instruction was given, however, the jurors already had been exposed to evidence, in the form of Calloway's testimony, from which they would have surmised that Mary had chosen not to testify.  Had the offending parts of Calloway's testimony not come into evidence, the instruction could have been effective to eliminate speculation by the jurors about Mary's testimony, by giving them an impression of neutral non-appearance.  It was not effective, however, to cure the prejudice caused by the jury's being informed, in so many words, that Mary's non-appearance was not a neutral happening, but was a product of her own choice.

## II.

The appellant contends that the evidence was insufficient to support his convictions, because it could not support a reasonable finding that he was the shooter.  We address this issue because we are reversing the appellant's convictions for the reasons explained above, and must determine whether he properly may be retried.

In reviewing a challenge to the sufficiency of the evidence, " 'it is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case.' "  *White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001) (quoting *McDonald v. State*, 347 Md. 452, 474, 701 A.2d 675 (1997)).  Rather, we must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781,

61 L.Ed.2d 560 (1979); *State v. Suddith*, 379 Md. 425, 429, 842 A.2d 716 (2004); *State v. Smith*, 374 Md. 527, 533, 823 A.2d 664 (2003). This standard applies whether the verdict was based on direct or circumstantial evidence. *Polk v. State*, 378 Md. 1, 8, 835 A.2d 575 (2003); *State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336 (1994). In applying this standard, we " 'give due regard to the [fact finder's] findings of fact, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.' " *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821 (2002) (quoting *McDonald, supra,* 347 Md. at 474, 701 A.2d 675). The trier of fact is entitled to accept or reject all, part, or none of the testimony of a witness. *Brandon v. Molesworth*, 104 Md.App. 167, 197, 655 A.2d 1292 (1995), *aff'd in part, rev'd in part on other grounds*, 341 Md. 621, 672 A.2d 608 (1996).

The evidence viewed most favorably to the State showed that the appellant was known to drive a distinctive-looking car. At the precise time of the shooting, that car was parked in front of Mary's apartment building. Witnesses heard the shots and immediately saw a man emerge from the apartment building, holding his pants in a manner indicating that he was carrying a gun beneath his clothing. The witnesses inferred, as reasonable people could, that the man was the shooter. The man got into the distinctive-looking car and drove away. He returned within minutes and reentered and again left the apartment building.

The evidence of a prior connection between the appellant and the distinctive-looking car and the evidence that the shooter left the building and got into that car were sufficient to support a reasonable inference that the appellant was the shooter. That inference was further supported by evidence that witnesses who saw the man described his general physical characteristics as fitting those of the appellant. The evidence that the man returned to the building suggested that he was not a stranger to Mary's apartment, *i.e.*, that the shooter was not someone who randomly had broken into the apartment.

■ In addition, the State presented evidence of admissions of guilt and consciousness of guilt by the appellant. Fourteen minutes after the shooting he called his brother and repeated over and over that he was in trouble. Later that night, the appellant called Calloway and said he had "just done something that may send him to jail for the rest of his life." There also was evidence that, when confronted by his brother with rumors that he had committed a shooting, the appellant did not deny the rumors.[2] For two months after the appellant knew a warrant had been issued for his arrest, he hid from the police.

Finally, there was evidence that the appellant had a motive to kill the victim: jealousy. As explained in our discussion of the first issue, the victim, Boyd, was Mary's boyfriend, and there was evidence that Mary had rejected the appellant's attempts to resume a romantic relationship with her.

The appellant's sufficiency argument focuses on testimony by Calloway that he was the only person known to drive the distinctive-looking Mercury Sable. He argues that there was credible evidence at trial that he was *not* the only person known to drive that vehicle, and that, that evidence, together with evidence that the vehicle was found abandoned, showed that it could have been stolen or used by someone other than him.

This argument ignores the standard we apply on sufficiency review. The testimony by Calloway was that only the appellant drove the vehicle in question. Notwithstanding other testimony less favorable to the State on that point, we are constrained to view the evidence in the light most favorable to

---

**2.** This evidence came in when excerpts of a tape-recorded interview by the police of Antonio were played for the jury. The propriety of admitting that evidence is the subject of one of the appellant's questions presented. We do not reach that question, because it is not necessary to do so, and the circumstances under which the tape was ruled into evidence may not repeat themselves on retrial. We are not suggesting, however, that the court's ruling was proper. In reviewing evidentiary sufficiency, we can take into account all evidence admitted at trial, whether or not properly admitted. *Emory v. State,* 101 Md.App. 585, 629, 647 A.2d 1243 (1994).

the verdict. Reasonable jurors could have credited Calloway's testimony about the car, and used it to support the inference, discussed above, that the appellant was the man who got into it immediately after the shooting, and was the shooter.

The evidence we have recounted was sufficient to support the appellant's convictions.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**